**Wyatt M. ROSE, Plaintiff,**

v.

**EASTERN NEBRASKA HUMAN SERVICES AGENCY et al., Defendants.**

Civ. No. 78-0-192.

United States District Court,
D. Nebraska.

March 24, 1981.

Bruce G. Mason, Omaha, Neb., for defendants.

SCHATZ, District Judge.

Plaintiff instituted this action for damages and equitable relief alleging deprivation of his civil rights in violation of 42 U.S.C. §§ 1981, 1983, 1985 and 2000e, *et seq.*, by the Eastern Nebraska Human Services Agency (ENHSA), an agency of local government, and various agents of ENHSA. Plaintiff's second amended complaint alleged five claims for relief:

1) That defendants, acting under color of state law, wrongfully terminated plaintiff's employment with ENHSA on the basis of his race in violation of 42 U.S.C. §§ 1981, 1983, and 2000e, *et seq.*;

2) That plaintiff was deprived of his rights under the due process and equal protection clauses of the Fourteenth Amendment and his rights under the First Amendment of the United States Constitution by defendants' termination of plaintiff's employment without affording him a hearing and without following ENHSA's personnel procedures;

3) That defendants engaged in a scheme and conspiracy designed to deny plaintiff rights guaranteed under the Constitution and laws of the United States in violation of 42 U.S.C. § 1985(3);

4) That plaintiff's reputation was severely damaged by adverse publicity regarding his integrity and employment record which was communicated to the Nebraska Department of Labor and prospective employers, through efforts of the defendants, in violation of plaintiff's rights under the Fourteenth and First Amendments; and

5) That ENHSA, as an agency of the government, prejudged plaintiff "guilty" on a robbery charge for which he was arrested, without a fair trial, and punished him for a crime he did not commit in violation of his First, Fourth, Sixth, Eighth and Fourteenth Amendment rights.

The Court has jurisdiction of the parties and of the subject matter of this action under 28 U.S.C. §§ 1331 and 1343. This suit

Clyde A. Christian, Omaha, Neb., for plaintiff.

was tried to the Court sitting without a jury. This memorandum opinion shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). For the reasons set forth in this opinion, the Court concludes that plaintiff's complaint must be dismissed on its merits.

## I. THE FACTS

The facts are these. The plaintiff, Wyatt M. Rose, is a black male who was employed by the Chemical Dependency Division of the Office of Mental Health, a division of the defendant ENHSA. ENHSA is a local government agency, existing pursuant to the provisions of the Nebraska Interlocal Cooperation Act, Section 23–2201 through 23–2207, Neb.Rev.Stat.1943, and consisting of joint participation by the Nebraska counties of Douglas, Dodge, Washington, Sarpy and Cass. ENHSA's Office of Mental Health is funded through a combination of funds from federal grants, the State of Nebraska, and contributions from the five participating counties. Defendant Shelton Duruisseau is the former Director of ENHSA's Office of Mental Health. Defendant Robert Boffi is the former Director of the Chemical Dependency Division of the Office of Mental Health. Defendant Joseph Yancey is a former supervisor of the Chemical Dependency Division's Cuming Street Half-way House. Defendant Les Tighe is the Personnel Director of ENHSA.[1]

Plaintiff was employed by ENHSA's Office of Mental Health as a Client Services Advocate at Central Intake from September 1, 1976, until his voluntary resignation for personal reasons on September 15, 1977.

During that period of time, plaintiff was a dependable employee and received excellent appraisals from his supervisors.

On October 4, 1977, plaintiff was reemployed by ENHSA as a Drug Counselor I at the Cuming Street Half-way House, and remained in that position until his discharge on December 6, 1977. Under ENHSA personnel policies, plaintiff was classified as a probationary employee during his October 4—December 6 period of employment.[2] ENSHA was aware when it hired plaintiff for the first time on September 1, 1976, and when it hired plaintiff the second time in October, 1977, that plaintiff had been previously convicted of at least one felony and had been incarcerated in the Nebraska Penal and Correctional Complex, and also that plaintiff was on a methadone maintenance program for heroin addicts.

On November 4, 1977, defendant Joseph Yancey, a black male, assumed the supervisory duties for the Cuming Street Half-way House, which included supervision of the plaintiff. The half-way house provided a residence and counseling for clients that came from a number of sources, including the criminal justice system in the local area, as well as from contracts with the Bureau of Prisons for federal parolees, and people who were referred in off the street. The Cuming Street Half-way House was staffed twenty-four hours a day by four full-time counselors.

The nature of plaintiff's work as a drug counselor at the half-way house was to develop a treatment plan for individual clients assigned to him, to follow his prescribed objectives and treatments for those clients

---

1. Ray Christensen, the Executive Director of ENHSA, was originally named as a defendant to this suit, but was dismissed by stipulation of the parties at trial.

2. During the plaintiff's period of employment with ENHSA, Personnel Policy No. 2.10 was in effect, which provided in relevant part:

   Newly Hired Employees
   A. It is anticipated that all employees, other than those hired on a temporary or seasonal basis, will be permanent. However, in order to give the Department Heads an opportunity to evaluate the employee's interest in the job and his ability to effectively perform the work, continued employment will be subject

   to a probationary period of three calendar months from the individual's start date. *This probationary period may be extended for a period of up to an additional 90 days with office director approval.* If the individual's performance is satisfactory *during this period,* he will become a permanent employee.
   B. Employees, other than seasonal or temporary, but including those still in their probationary period, shall have recourse to the grievance procedure in matters affecting their employment. However, probationary employees shall not be eligible for promotion.
   \*   \*   \*   \*   \*   \*

   Plaintiff's Exhibit 2 (Emphasis in original.)

based on the treatment plans, and to hold two to three counseling sessions per week with his individual clients. In addition, he was to serve as a general custodian for the house's residents while he was on duty.

Rose primarily worked the 11 p. m. to 7 a. m. shift during the month of November, 1977. During that month, Yancey received some complaints from another staff member at the house who worked the shift before Rose about Rose showing up late for his shift. On November 22, 1977, Rose failed to show up at all for his scheduled shift, and Yancey himself covered the shift that evening. From November 4 until November 29, however, Yancey had no discussions with the plaintiff Rose regarding his duties or work performance. On November 30, following a general staff meeting, Yancey discussed with Rose the November 22 incident and the complaints about Rose's tardiness. Plaintiff's last working day with ENHSA was November 30, 1977, although he was scheduled to work December 1, 2 and 5.

Rose was scheduled to report to work at 11 p. m. on the evening of December 1. That afternoon, Yancey received a phone call from an officer of the Omaha Police Department requesting that he check the Cuming Street House's daily log to determine if Rose was at work on a particular day. He informed Yancey that Rose was being questioned in connection with a robbery. When Yancey refused to release that information, Rose came to the phone and told Yancey to give the police officer the information he requested. Rose failed to explain to Yancey his situation or comment on whether he would be able to work his scheduled shift that evening. On leaving the house that evening, Yancey instructed the staff member working the 3 p. m. to 11 p. m. shift to call him if Rose did not appear for work at 11 p. m. At 11:30 p. m., Yancey was informed that Rose had neither called nor appeared for work. The staff member working the 3 p. m. to 11 p. m. shift stayed until 7 a. m. the next morning to cover Rose's shift. On the morning of December 2, a Friday, Yancey initiated termination procedures against Rose for his absences of November 22 and December 1 and his failure to notify his supervisor that he would be unable to work his shift on those days. Yancey submitted the paperwork necessary for Rose's termination, consisting of a completed Personnel Action Form (PAF) and final appraisal, to defendant Robert Boffi, who was both Yancey's supervisor and the Director of the Chemical Dependency Division. Boffi decided to hold up the paperwork for Rose's termination for a few days. That afternoon, Yancey read an article in the evening edition of the December 2, 1977, Omaha World Herald, which stated that Rose had been arrested in connection with an armed robbery. Yancey notified Boffi of that fact.

Rose was scheduled to work on December 2 and 5 but failed to call in or appear to work his shift. On December 5, Boffi called Yancey to inquire whether Rose had called or appeared for work. On learning that Rose had not, Boffi consulted defendant Les Tighe, ENHSA's personnel director, for clarification of ENHSA's policies regarding termination of probationary employees to insure that such policies were being followed with regard to Rose. After Boffi described the situation, without mentioning Rose by name, Tighe informed him that ENHSA's personnel policies[3] would permit

---

**3.** Personnel Policy No. 7.60, in effect at the time of Rose's termination, covered "Termination During Probationary Period:"

All individuals employed at HSA will be hired on a probationary basis. The length of this probationary period is to be a minimum of 90 days. While on a probationary status, the employee is given an opportunity to take a look at HSA and in turn HSA has the opportunity to appraise the employee. Termination may be initiated by either the employee or HSA with one day's notice at any time during the probationary period. No notice

will be necessary if this termination is for disciplinary reasons.

At some point before the end of the 90 day probation the new employee should be appraised by the supervisor. If the new employee's performance is below acceptable levels, or if the employee does not appear to adjust to the position, it is best that he be terminated as soon as possible. (See Policy # 3.70.)

PROCEDURE: If a probationary employee is terminated, complete a Personnel Action Form and submit it immediately to the Per-

termination of a probationary employee under the circumstances. Boffi then approved Yancey's recommendation that Rose be terminated and forwarded the paperwork to his own supervisor, defendant Shelton Duruisseau, then the Director of the Office of Mental Health.

On December 6, Duruisseau approved Yancey's decision to terminate Rose, without further independent investigation, based on his view of the propriety of the reasons for the termination contained in the PAF and final appraisal. Rose's termination became effective on December 6. On that same day, Rose called Yancey to inform him that he had been released on bond, and a meeting was set up at the Half-way House. On Rose's arrival at the Half-way House, Yancey and Boffi met with Rose and told him that his employment had been terminated. Since the PAF and final appraisal were still being processed by ENHSA's central office, the reasons for his termination were verbally communicated to him. Rose was also informed that he had five days within which to file a grievance under ENHSA's personnel policies. Rose did not see or sign his PAF or final appraisal due to the unavailability of the paperwork, nor was Rose given one day's notice of his termination. On December 7, an employment requisition was posted for a replacement for Rose. Lawrence McGruder, a black male, was hired as Rose's replacement.

Rose failed to file a grievance within five days of his termination. However, after his dismissal, he made application for unemployment compensation benefits to the Nebraska Department of Labor. In February, 1978, Rose was notified that the determination made on his application reflected that he was disqualified from receiving benefits for an eight-week period from December 3, 1977, to January 28, 1978. In addition, another eight-week reduction in benefits of $68 per week was assessed. The partial disqualification and reduction in benefits was assessed as a penalty in view of the

claim deputy's determination that Rose had been separated from ENHSA for reasons of misconduct under Nebraska law. Rose's absences, combined with his failure to notify his supervisor, were deemed misconduct in view of the twenty-four hour operation of the Half-way House and ENHSA's need to have employees of the house report on schedule.

Under the impression that nothing adverse was to be put in his personnel file regarding his termination, Rose went to see Yancey to complain about the reduction in benefits that had resulted and asked Yancey to write up the reasons for his dismissal for Rose's own records. Yancey composed a typewritten memo dated March 9, 1978, and signed it. The memo stated that Rose was terminated for being absent on November 22 and December 1, 1977, without going through the proper means of notifying his immediate supervisor, but that Rose's work had been of high quality. Still dissatisfied, Rose filed a grievance to protest his termination on March 15, 1978.

Rose also visited Boffi to show him a letter Rose had received in February, 1978, from the Public Defender's Office, notifying him that all charges relating to the armed robbery in December had been dismissed. Boffi set up a meeting between Rose, defendant Les Tighe, and himself for April 4, 1978. At that meeting, Rose asked to be rehired in view of the fact that charges against him had been dismissed. Tighe and Boffi declined to rehire Rose, basing their decision on the fact that his absenteeism and failure to notify his supervisor, and not the charges that had been pending against him, were the reasons for his dismissal. At that time, Rose expressed concern that ENHSA personnel policies had not been followed in terminating his employment, and informed Tighe and Boffi that he wanted the matter reviewed through ENHSA's grievance procedures. Tighe agreed to review the situation to determine whether ENHSA policies had been followed.

sonnel Department. Prior approval of the Division Director should be obtained before an employee is informed of the termination. The supervisor should arrange a termination

interview with the Personnel Department. At that time the employee will receive his final paycheck.

In an April 7, 1978, letter to Rose, Tighe informed him that his termination was within the boundaries of agency policy on unexcused absences and that his position could not be offered back to him. Tighe also informed Rose that his grievance would not be forwarded to the Personnel Advisory Committee for review, since ENHSA's grievance policy allowed him only five days after notification of his termination to file a grievance, and Rose had been notified on December 6, 1977, but waited to file a grievance until March 15, 1978. Tighe stated that the agency would take some action in Rose's behalf, however: Yancey's memo of March 9, and any additional information Rose wished to submit, would be attached to his final appraisal, although the appraisal itself would not be altered; information other than his dates of employment and position title would not be released by ENHSA without Rose's written authorization; and a memo from Boffi would be placed in his personnel file outlining the positive aspects of Rose's job performance.

Rose filed a charge of racial discrimination against ENHSA with the Nebraska Equal Opportunity Commission and the United States Equal Employment Opportunity Commission (EEOC) on April 6, 1978. Plaintiff instituted this suit on May 8, 1978. A right to sue letter was issued by the EEOC on May 9, 1979, and plaintiff's complaint was amended to add a charge of racial discrimination under Title VII of the Civil Rights Act of 1964.

In essence, plaintiff bases his right to recover in this action upon three theories that the Court need consider:[4]

1) That plaintiff was wrongfully discharged and not rehired on the basis of his race in violation of Title VII and 42 U.S.C. §§ 1981 and 1983;

2) That plaintiff was deprived of a constitutionally protected property interest in continued employment at ENHSA without due process of law in violation of both the First and Fourteenth Amendments of the United States Constitution; and

3) That plaintiff's termination by ENHSA damaged his reputation so as to deprive him of a constitutionally protected liberty interest without due process of law in violation of both the First and Fourteenth Amendments.

Each of these claims will be considered separately herein. For the reasons discussed below, the Court is of the opinion that plaintiff has failed to prove by a preponderance of the evidence his right to recover under any of the above theories.

## II. EMPLOYMENT DISCRIMINATION

With respect to his claims of racial discrimination in employment, plaintiff proceeded at trial on the theory that defendants subjected him to disparate treatment on account of his race.[5] In *McCosh v. City of Grand Forks*, 628 F.2d 1058 (8th Cir. 1980), the Eighth Circuit compared the methods of proving racial discrimination in

4. Plaintiff's claim of conspiracy under 42 U.S.C. § 1985 has been abandoned. Assuming that plaintiff's claims that he was "prejudged guilty" on his arrest charge without a fair trial and punished for a crime he did not commit even state a claim upon which relief can be granted under the First, Fourth, Sixth, Eighth and Fourteenth Amendments, the Court's resolution of plaintiff's claim of employment discrimination makes clear that Rose was not terminated because of his arrest. Therefore, these claims merit no discussion.

5. Plaintiff's complaint alleged that Rose had been terminated because of his arrest, that his termination on that basis disproportionately affects him as a black citizen, and that the use of arrest for purposes of termination is not job-related. To support this "disparate impact" the-

ory, plaintiff pleaded a number of statistics purportedly showing that blacks are arrested and convicted at a significantly higher percentage than their population representation in the State of Nebraska. However, at trial, such statistics were not introduced into evidence, nor was the Court presented with any evidence of the validity of those statistics or a request for judicial notice of the validity of those statistics. In addition, no evidence was presented to the Court from which an ENHSA practice of terminating employees because of arrests, or even inquiring into the arrest or conviction records of prospective employees, can be inferred. The Court concludes that the unsubstantiated allegations of plaintiff's complaint thus failed to establish a prima facie case of "disparate impact."

employment under Title VII under the disparate impact and disparate treatment theories. When an individual alleges that he has been subjected to "disparate treatment" on account of his race, the following standards and order of proof apply:

First, the plaintiff must show the existence of "actions taken by the employer from which one can infer, if such actions remained unexplained, that it is more likely than not that such actions were 'based on a discriminatory criterion illegal under the Act.'" *Furnco Const. Co. v. Waters, supra,* 438 U.S. [567] at 576, 98 S.Ct. [2943] at 2949 [57 L.Ed.2d 957] [1978], *citing Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 3:'6 (1977).[3]

[3] As inu':ated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973), a plaintiff may establish a prima facie case of "disparate treatment" by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 1062.

Once a plaintiff establishes this prima facie case, the burden shifts to the employer to rebut the adverse inference by articulating "some legitimate nondiscriminatory reason for the employee's rejection." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). But even if the employer meets this burden, the complaining party is given the opportunity to show that the proffered evidence is merely a pretext for discrimination. *Id.* at 804–05, 93 S.Ct. at 1825. *See generally Kirby v. Colony Furniture Co.* [8 Cir., 613 F.2d 696], *supra.*

■ The elements of a prima facie case as outlined in *McDonnell Douglas,* a refusal-to-hire case, are somewhat modified in the context of a discharge case. A prima facie case of racially discriminatory discharge, under the standards of *McDonnell* and *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978), is made out by the plaintiff demon-

strating: (1) that he is black; (2) that he was demonstrably capable of performing his employment duties; (3) that he was discharged; and (4) that his employer sought people with his qualifications to fill his former job after his discharge. *Osborne v. Cleland,* 620 F.2d 195, 198 (8th Cir. 1980); *Metcalf v. Omaha Steel Casting Co.,* 507 F.Supp. 679 at 686 (D.Neb.1981) (slip op. at 11–12).

Under these standards, the Court finds that plaintiff has succeeded in establishing a prima facie case of racially disparate treatment under Title VII. It is undisputed that Rose is black and was discharged. Rose's superviser, Yancey, testified at trial that at the time he took over the supervisory duties of the Cuming Street House, Rose was presented to him as a "conscientious, hard-working, dedicated drug counselor who was interested in his clients, who did good work," by both the interim supervisor of the house and her immediate supervisor, defendant Boffi. T. 150: 16–18. In addition, Yancey testified that on November 30, 1977, he personally had the opportunity to observe Rose "effectively introduce two new clients into a totally strange environment, totally strange surroundings, make them comfortable, develop a treatment plan [and] communicate with them." T. 151: 5–8.

Yancey's testimony establishes that Rose was demonstrably capable of performing his employment duties. After his discharge, a requisition was posted for a replacement for Rose, demonstrating that ENHSA sought people with Rose's qualifications to fill his former job after his discharge. Therefore, plaintiff has succeeded in establishing the four requisite elements of his prima facie case.

■ However, a "prima facie showing is not the equivalent of a factual finding of discrimination * * *." *Furnco, supra,* 438 U.S. at 579, 98 S.Ct. at 2950. Proof of a discriminatory motive is critical in a disparate treatment case, *Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977), and the ultimate burden of persuasion on that issue

remains with the plaintiff. As the Eighth Circuit explained in *Kirby v. Colony Furniture Company, Inc.*, 613 F.2d 696, 702 (8th Cir. 1980):

> [T]he employer as a Title VII defendant does not have to prove absence of discriminatory motive to escape liability; a prima facie showing of disparate treatment shifts only the burden of producing evidence to the employer, not the burden of persuasion. *See Board of Trustees v. Sweeney, supra*, 439 U.S. [24] at 25, 99 S.Ct. 295 [58 L.Ed.2d 216] [1978]; *id.* at 29, 99 S.Ct. 295 [at 297] (Stevens, J., dissenting).

■ To meet that burden of production, the employer need only articulate some legitimate nondiscriminatory reason for the employee's treatment to dispel the adverse inference from plaintiff's prima facie showing. *Furnco, supra*, 438 U.S. at 577–78, 98 S.Ct. at 2949–50; *Kirby, supra*, 613 F.2d at 702–03. At trial, defendants produced evidence to show that Rose was discharged because of his unexcused absences on November 22 and December 1, and his failure to properly notify his immediate supervisor that he would be unable to work his shift on those days, indicating that Rose lacked the job dependability required in view of the twenty-four hour a day coverage at the Cuming Street facility. Rose's immediate supervisor, defendant Yancey, testified that his reasons for initiating Rose's termination were that, in view of the nature of that facility, "it was absolutely necessary that we have staff that were dependable enough to be there and show up for their scheduled time of coverage, and if not, that they would be able to give decent enough notice to be able to give us a chance to work about trying to get other coverage for the shift." T. 124: 20–25.

Defendant Boffi, Yancey's supervisor, testified that he approved Yancey's recommendation for Rose's dismissal for the reasons of absenteeism and failure to notify his supervisor because "it is very important for us to maintain a twenty-four [hour] operation, which then meant that there was an issue of reliability and being able to schedule proper coverage of our facility by our staff without having to, if you would, impose on other people, other staff people, the supervisor, to cover their shifts." T. 59: 16–21. Similarly, defendant Duruisseau testified that he approved the paperwork for Rose's termination without further investigation because it was clear that the reasons were appropriate, and that the action taken was not too severe or drastic in view of the information he had relative to the Cuming Street program itself. Duruisseau testified that at the particular time, the "Cuming Street halfway house was in a state of flux and in some sense turmoil, in terms of operating," and that several supervisors had been temporarily responsible for the program. T. 205: 4–6.

Defendants' evidence also establishes that several different people had acted as supervisor in the four to six months before Yancey took over the supervisory duties of the Half-way House, and that the facility had been plagued with staff problems, including excessive overtime, switching of scheduled time, and general dissension among the staff. Yancey was hired with the instructions that he was to bring some stability back into the program and ease staff dissension.

Rose's probationary status was also articulated by defendants as being of significance in his discharge. Yancey testified that "probationary status is the time for an employee to take a look at the Agency, and it's also the time for the Agency to take a look at the employee," T. 126: 11–13. Yancey stated that if the employee did "not seem to be working out well," it was incumbent upon the Agency to make the decision to discharge him before his probationary period was over. ENHSA's Personnel Policy 2.10, "New Employee Probationary Period," buttresses that conclusion. Yancey further testified that it is a "simple management programmatic decision" that you need employees you can depend upon in a twenty-four hour facility and "if you have got somebody there that is not meeting up to that expectation, and especially if they're a probationary employee, it's time for him to go." T. 126: 3–6.

The Court finds these reasons articulated for Rose's termination to be both legitimate and nondiscriminatory. Nothing in Title VII prohibits an employer from discharging an employee on probationary status for failing to work his scheduled shifts without notifying his supervisor, especially where business necessity requires twenty-four hour a day coverage at the employer's facilities. Thus, defendants have met the burden of articulating a legitimate nondiscriminatory reason for Rose's dismissal, and it becomes incumbent on plaintiff to show the proffered reason was a pretext for discrimination. *See McCosh, supra,* 628 F.2d at 1062. To meet this burden, plaintiff argues that he was dismissed not because of his absenteeism, but because he was arrested on December 1, 1977, and subsequently incarcerated until December 6, 1977. Plaintiff then argues that dismissal because of his arrest establishes defendants' racial animus in this case.

Plaintiff's testimony at trial is offered as probative on the pretext issue. Rose testified that at his December 6, 1977, meeting with Yancey and Boffi, he was told that termination procedures had been initiated against him not only because of his absences of November 22 and December 1, but also because "plus, you know, the fact that my possible trial would have some—might have a bad reflection on the agency." T. 44: 10–11. Rose further testified that nothing was mentioned about his unreliability or failure to notify his supervisor, and that he had never heard anything about being unreliable until after his arrest, stating that before then, "I was a model employee, never had a reprimand, written or verbal, about absenteeism or tardiness or anything else." T. 44: 21–23. Rose denied that Yancey had discussed any problems of absenteeism or tardiness at the November 30 meeting. Rose testified that Yancey had mentioned the November 22 date and his understanding that Rose had only requested half a day off work, but that Rose explained that he had asked for the entire day off. Rose claimed that such conversation was the only discussion of absenteeism at the November 30 meeting.

Rose also denied at trial that he had failed to inform Yancey that he would be unable to work his scheduled shift on December 1. Rose testified that when he was picked up for questioning on December 1, 1977, he told the police officer that he was scheduled to work at 3 p. m. that day (not 11 p. m.), and wanted to call his supervisor, but that the officer had made the call instead. When Rose was allowed to talk to Yancey, Rose claimed "I told Mr. Yancey that I was being held as a suspect on a robbery charge, that I didn't know when I was going to be released on this charge, but that when I was released I would report to work," T. 17: 5–8, and that Yancey thanked him for calling so that he could get someone to cover Rose's shift.

Yancey's testimony directly contradicts that of Rose. Rose claimed that Yancey lied in testifying that Rose didn't relate that he was in custody or unable to work his shift, testifying "because that is the first thing that he asked, would I be at work that night, to get coverage, just in case I did not show, and so I told him that I had no idea when they were going to let me go, but as soon as I got released I would contact him." T. 39: 21–25.

Yancey, on the other hand, testified that he talked to Rose for only thirty to sixty seconds and that Rose failed to explain anything about the situation at all. Yancey testified that all he knew was what the police officer had told him, *i. e.,* that Rose was being questioned in connection with a robbery. Yancey testified that since Rose was scheduled to work at 11 p. m., he was concerned that "for whatever reason he would not show up and would not follow the proper procedures, at which point I would be left holding the bag again with no coverage and have to work, you know, to have somebody cover that shift." T. 123: 20–23. Therefore, when he left the Halfway House at 5 p. m., Yancey instructed his staff *to call him if Rose failed to show up or* call, and he received such a call at about 11:30 p. m. that evening.

Rose's testimony concerning the December 6 meeting also directly contradicts that

of Yancey and Boffi. Rose testified that Boffi had asked Rose to go along with the termination, bringing up the point that "they gave me a chance when I got out of the Pen and gave me a job, and so forth," and explaining that his arrest and possible trial and conviction might "reflect on the halfway house and possibly give it a further bad name." T. 20: 5–12. Rose also testified that he was told he could get his job back if he were exonerated from the robbery charge, and that his personnel file would indicate that Rose left the agency for personal reasons so that there would be no adverse reflection on Rose at all.

Yancey and Boffi denied making any of these statements and testified that it was explained to Rose that since he was a probationary employee, his termination during a probationary period for absence and failure to notify his supervisor wouldn't reflect adversely upon him.

As indicated previously in the Court's discussion of the facts of this case, after closely observing the demeanor of the witnesses during trial and having carefully reviewed the entire record, the Court credits the testimony of Yancey and Boffi finding the same to be more credible than that of the plaintiff. Thus, plaintiff's testimony fails to establish that the articulated reasons for his dismissal were pretextual.

Plaintiff also argues that the fact that termination procedures were initiated against him on December 2, before his release from jail, shows that the real intent for his discharge was his "criminal status." The Court finds that fact to be of little probative value. As noted above, the Court credits Yancey's testimony that he did not know of Rose's actual situation at the time he initiated the termination procedure on the morning of December 2, and that he had already passed the paperwork to his own supervisor before reading the World Herald article about Rose's arrest. Even after Yancey informed his supervisor, Boffi, that Rose had been arrested, Boffi held up the paperwork until December 5 to give Rose a chance to call Yancey. These facts are clearly inconsistent with an intent to discharge Rose because of his arrest or "criminal status."

Nor does the Court find merit in plaintiff's argument that failure to follow ENHSA personnel policies in dismissing him establishes that the reasons for his discharge were a pretext for racial discrimination. The Court specifically finds that the only personnel policies directly applicable to Rose's dismissal were ENHSA's Policy No. 2.10, "New Employee Probationary Period," and Policy 7.60, "Termination During Probationary Period." Policy 6.70, "Grievance Procedure," was also implicated because Policy 2.10 provides that probationary employees shall have recourse to the grievance procedure, as were Policy 3.70, "Employee Appraisal," and Policy 3.80, "Personnel Action Form," because Policy 2.10 expressly refers to those provisions. On reading these policies in the context of the whole of ENHSA's Policy and Procedure Manual, it becomes clear that a probationary employee, such as plaintiff, is terminable at will, and other policies relating to permanent employees which define "causes" for which permanent employees can be dismissed were inapplicable to Rose. This is true even if ENHSA management personnel chose to use them as a guide in deciding whether a probationary employee should be dismissed. While plaintiff argues that he was discharged in violation of ENHSA's Policy 4.12, which provides that an employee who is absent *three consecutive* work days without notification of his supervisor may be dismissed, the Court concludes that Policy 4.12 was inapplicable to Rose in view of his probationary status. While defendants used the definition of unexcused absences,[7] contained in Policy 4.12, as a guide in terminating Rose, their failure to comply with the substantive provisions of that policy fails to establish that their reasons for dismissal were pretextual since that policy was inapplicable to probationary employees.

---

7. "Unexcused absences are those involving employees absent without an approved reason or who were absent without receiving advance approval from a supervisor." Plaintiff's Exhibit 2.

Plaintiff also relies on the facts that he was not given one day's notice of his termination under Policy 7.60, nor was he given the opportunity to sign his PAF or final appraisal under Policy 3.70 and Policy 3.80.[8] While failure to follow established procedures may be sufficiently probative in some cases to establish pretext, the Court cannot agree that this evidence is sufficient to prove the issue on the basis of the record here. While defendants concede that Rose was not given one day's notice of his termination or the opportunity to sign his appraisal or PAF, any inference of disparate treatment that may be drawn from these procedural departures was adequately rebutted by defendants at trial. The Court credits Yancey's testimony that Rose was not notified prior to his termination because Yancey was unsure of where he was, since he had failed to call in. In addition, defendant Tighe, ENHSA's Personnel Director, testified that the reasons for Rose's termination were considered disciplinary in nature, and Policy 7.60 provides that no notice is necessary if termination is for disciplinary reasons. The evidence also establishes that Rose's PAF and final appraisal were being processed at ENSHA's central office when Rose called on December 6, and were, therefore, unavailable for Rose to sign at the December 6 meeting when he was informed of the reasons for his termination.

The Court concludes that plaintiff has failed to establish that defendants' articulated reasons for his termination were a pretext for racial discrimination. While defendants relied at trial only upon Rose's November 22 and December 1 absences, and his failure to notify his supervisor, other evidence in the record also supports the conclusion that Rose was dismissed because he lacked the job dependability required in the twenty-four hour a day operation of a facility staffed by only four full-time employees. ENHSA time reports, signed by

Rose, indicate that he was also absent from work on November 4, 9, 12, 13 and 14. The log book from the half-way house indicates that Rose was scheduled to work the 11 p. m. shift on November 4, but called a co-worker to work for him late in the evening, explaining that an emergency had arisen. The log entry for that date indicates that Yancey was not notified of the change, and Rose's time reports for that date indicate eight hours of absent without pay.

Defendants don't dispute that Rose's absences of November 9, 12, 13 and 14 were due to illness, and were, therefore, considered "excusable." However, the time reports show that Rose was paid for only six of those missed hours as sick leave and the other hours were categorized as without pay. In addition, the log entries for those dates indicate that Rose's co-worker working the 3 p. m. to 11 p. m. shift on November 9 was unable to contact anyone after Rose called in sick, and was, therefore, forced to cover Rose's 11 p. m. to 7 a. m. shift, as well as his own, in addition to having to find a substitute to cover his shift on November 10. The log entries for November 12 indicate a similar problem in covering Rose's shift for that day.

This evidence indicates the problems visited upon the facility by an employee's absence, whether excusable or not. In addition, the number of absences Rose accumulated during the one-month period of November, 1977, especially in view of his probationary status, lend plausibility to Yancey's concern about the absences of November 22 and December 1. The Court finds that Yancey could have legitimately taken such a history of absenteeism into account in making the decision to terminate Rose, a probationary employee, whether or not ENHSA's personnel policies defined absence due to illness as excusable.

In sum, the Court concludes that plaintiff has failed to prove by a preponderance of

---

**8.** Policy 3.70 provides in part:
  All appraisals must be signed by *BOTH* the *SUPERVISOR* and the *EMPLOYEE*.
  Policy 3.80 provides in part:
  Supervisors must review all changes on PAFs with the employee affected. The *employee*

and the *supervisor* must sign the PAF and forward it up the chain of command for necessary signatures.
  Plaintiff's Exhibit 2. (Emphasis in original.)

the evidence that his termination was racially motivated. While plaintiff established a prima facie case of disparate treatment, defendants articulated a nondiscriminatory reason for his discharge, and plaintiff has failed to prove that reason was a pretext for racial discrimination. The Court also notes that plaintiff's termination was initiated by a black, Joseph Yancey, and finally approved by a black, Shelton Duruisseau. A black was hired as Rose's replacement. Statistics offered by defendants at trial reveal that between Rose's termination in December, 1977, and July 3, 1979, approximately seventy-five per cent of the drug counselor jobs in the Chemical Dependency Division of ENHSA have been held by blacks. While not dispositive, these facts also serve to dispel any inference of racial animus on the part of defendants. *See Stevens v. Junior College of St. Louis,* 548 F.2d 779, 780–81 (8th Cir. 1977).

In view of the above discussion, plaintiff's argument that defendants' failure to rehire him in April of 1978, after the robbery charges had been dismissed, was a separate act of racial discrimination can be summarily dismissed. Plaintiff was clearly not rejected for re-employment because of his arrest or criminal status, but because he had been found undependable and therefore unqualified for a drug counselor's position in light of the agency's previous experience with plaintiff.

■ The Court's treatment of plaintiff's Title VII claim also disposes of the Section 1981 claim since Section 1981 "affords no greater substantive protection than Title VII." *New York City Transit Authority v. Beazer,* 440 U.S. 568, 584 n. 24, 99 S.Ct. 1355, 1364 n. 24, 59 L.Ed.2d 587 (1979). Accordingly, plaintiff's claims of racial discrimination in employment under both Title VII and Section 1981 must be dismissed.[9]

### III. PROPERTY INTEREST

Plaintiff also claims, as a public employee, that his discharge without a hearing and in violation of ENHSA's own personnel policies deprived him of a property interest in his employment status, protected by the due process clause of the Fourteenth Amendment, as well as deprived him of his "right to hold a job of his choice" as protected by the First Amendment.

■ Plaintiff's First Amendment claim merits little discussion. The Court has been directed to no decisions establishing a First Amendment right of a public employee to hold the job of his choice. The interest in holding a job with a governmental agency is not itself a First Amendment interest. *See Board of Regents v. Roth,* 408 U.S. 564, 575 n. 14, 92 S.Ct. 2701, 2708 n. 14, 33 L.Ed.2d 548 (1971). Instead, the protections of the First Amendment come into play when a government employer makes the decision to deprive a public employee of the benefit of government employment on a basis that infringes his interest in freedom of speech or association, since "if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized or inhibited." *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1971). The record in the instant case is totally devoid of any evidence that the defendants' decision to terminate Rose and not rehire him was based on Rose's activities of free speech or association.

■ With regard to Rose's Fourteenth Amendment claims, it is well settled that in order to establish procedural due process rights in a dismissal from employment, the claimant must first establish a property interest in the position. *Board of Regents v. Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709; *Perry v. Sindermann, supra,* 408 U.S. at 596–603, 92 S.Ct. at 2696–2700; *Kyles v. ENHSA,* 632 F.2d 57, 60 (8th Cir. 1980); *Brouillette v. Board of Directors,* 519 F.2d 126, 127–28 (8th Cir. 1975). It is equally

---

9. Section 1983 requires that Rose prove that he was deprived of a right secured by the Constitution and laws of the United States by defendants, acting under color of state law. Even assuming the defendants acted under color of state law, Rose has failed to prove that he was deprived of his right to be free from racial discrimination in employment secured by Title VII and Section 1981. Therefore, Rose's Section 1983 claim must also be dismissed.

well established that to have a property interest in employment, a person must have a "legitimate claim of entitlement to it," stemming "from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709.

■ Rose can establish no property interest stemming from state law. It is undisputed that Rose worked under no express contract, and under Nebraska law, in the absence of an employment contract for a fixed term, an employee is terminable at will. *Kyles v. ENHSA, supra,* 632 F.2d at 60, *citing Stewart v. North Side Produce Co.,* 197 Neb. 245, 248 N.W.2d 37, 38 (1976). Thus, to recover, Rose argues that the agency's Personnel Policy and Procedures Manual supports his claim of a property interest in his continued employment.

■ As already noted in discussion of plaintiff's claim of racial discrimination, it is undisputed that Rose's status was that of a probationary employee. While a permanent employee might successfully argue that ENHSA's personnel policies on separation from employment require separation only "for cause," or require in some instances a suspension period before termination, such a contention by a probationary employee must be rejected. *See Kyles v. ENHSA, supra,* 632 F.2d at 60. ENHSA's Personnel Policy and Procedure Manual lists seven categories of separation: resignation, quitting, involuntary separation, reduction in force, dismissal, retirement, and termination during the probationary period (Policy 7.60). The substantive and procedural provisions of Policy 7.60 are blatantly inconsistent with those in each of the other categories of separation. Policy 7.60 must be found to supercede all of the other separation policies in the case of a probationary employee if its contents are to be given any effect at all.

Under Policy 7.60, a probationary employee is terminable at will with one day's notice or no notice if the termination is for disciplinary reasons. Rose could be dismissed at the virtually unreviewable discretion of his supervisor for unsatisfactory performance or conduct during the probationary period. A finding that Rose held his position at the will and pleasure of ENHSA under ENHSA's personnel policies necessarily establishes that he had no property interest in his continued employment arising from such policies. *Bishop v. Wood,* 426 U.S. 341, 345 n. 8, 96 S.Ct. 2074, 2077 n. 8, 48 L.Ed.2d 684 (1976). Having failed to establish a property interest in his position, plaintiff has failed to establish that he was deprived of a right to a hearing prior to his termination due him under the Fourteenth Amendment.

Alternately, plaintiff appears to argue that in the event the Court finds that plaintiff has failed to establish a property interest in his continued employment, plaintiff would still be entitled to at least the process due him under ENHSA's personnel policies. Plaintiff argues that his "procedural and substantive due process rights," as well as his equal protection rights, were violated by ENHSA's failure to give plaintiff one day's notice of his termination and an opportunity to sign his PAF and final appraisal.

■ Plaintiff has failed to refer the Court to any authority supporting the proposition that, in the absence of any constitutionally protected property interest in employment, an agency's failure to follow its own procedures in terminating a probationary employee violates that employee's rights of due process or equal protection under the Fourteenth Amendment. The Supreme Court has noted that "where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures * * * even where the internal procedures are possibly more rigorous than otherwise would be required." *Morton v. Ruiz,* 415 U.S. 199, 235, 94 S.Ct. 1055, 1074, 39 L.Ed.2d 270 (1974). However, where an agency is not required by the constitution or by statute to adopt any particular procedures before engaging in a certain type of conduct, violations of those policies which an agency does adopt don't necessarily raise constitutional questions. *See United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1978).

In the instant case, the Court has concluded that plaintiff had no constitutionally protected property interest in his employment status. Therefore, ENHSA was not constitutionally required to adopt any particular procedures before terminating plaintiff. Thus, the instant case is distinguishable from *Sherman v. Yakahi*, 549 F.2d 1287 (9th Cir. 1977), in which the Court concluded that a civil service probationary employee had a limited property interest in his employment status that entitled him to no process beyond that provided for in the controlling regulations of the Civil Service Commission.

In *Sherman*, those applicable regulations gave even a probationary employee the right to a termination hearing at which he could call a reasonable number of witnesses and present closing arguments, and Sherman was not allowed to call witnesses or present closing arguments. The Court held that, because there was a more favorable outcome to which Sherman might have been entitled had the hearing been conducted according to the applicable rules, he had stated a cause of action for violation of the agency's own rules and his complaint should not have been dismissed for failure to state a claim upon which relief could be granted. *Id.* at 1292.

This is not a case in which the Court concludes on the basis of the strength of procedural protections afforded even a probationary employee that such an employee has a limited property interest in continued employment to the extent of a legitimate expectation that he will not be terminated absent compliance with those agency procedures. *See Beeson v. Hudson*, 630 F.2d 622 at 627 (8th Cir. 1980). Here the ENHSA personnel policies placed no substantial restriction on agency action in terminating a probationary employee which might lead to recognition of such a limited property interest. *Cf. O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 794, 100 S.Ct. 2467, 2480, 65 L.Ed.2d 506 (1980) (Blackmun, J., concurring) (where a substantial restriction inhibits governmental removal of a presently enjoyed benefit, a property interest will normally be recognized, although the term "property" some-

times incorporates limiting characterizations of statutorily bestowed interests) (reviewing cases). The Court finds that ENHSA's policies providing for one day's notice and providing that an employee must sign his PAF and appraisal do not amount to such substantial restrictions on agency action, nor do they give rise to a legitimate expectation on the part of a probationary employee that he will be continued in his employment absent compliance with such procedures.

In addition, any inconsistency of which plaintiff might complain "is purely one of form, with no discernible effect in this case on the action taken by the agency," or its treatment of the plaintiff, and therefore, cannot serve as the basis for a claim of denial of equal protection. *United States v. Caceres, supra*, 440 U.S. at 752, 99 S.Ct. at 1472. The Court rejects any claim that there was a more favorable outcome to which Rose might have been entitled had he been given one day's notice or been allowed to see and sign his PAF and final appraisal. In view of the Court's finding that Rose was apprised of the true reasons for his dismissal at the December 6 meeting with Yancey and Boffi, the Court finds no merit in plaintiff's argument that had he seen the reasons for his dismissal contained in those forms, plaintiff would have filed a timely grievance to protest his termination. ENHSA's Policy 3.70 on employee appraisals states that the major purpose of an appraisal is "to assure at least minimal communication between supervisor and employee." That purpose was fulfilled when Yancey and Boffi met personally with Rose and informed him of the reasons for his termination. Nor is the provision of one day's notice a substantial procedural guarantee which would have led to a more favorable outcome in Rose's case had it been granted.

Moreover, the failure to give Rose one day's notice or to allow him to sign his PAF and final appraisal was attributable to the fact that ENHSA supervisory personnel, as well as the Personnel Director responsible for administration of the relevant ENHSA policies, construed the situation as

one not requiring one day's notice, nor Rose's signature, under the particular facts of this case. This construction of their own policies, even if erroneous, was not obviously so, and that type of error by an agency in interpreting its own policies "surely does not raise any constitutional questions." *Caceres, supra*, 440 U.S. at 752, 99 S.Ct. at 1472. In sum, the Court concludes that any violation of ENHSA's policies disclosed by this record does not rise to the level of a deprivation of plaintiff's constitutional rights under the Fourteenth Amendment.

## IV. LIBERTY INTEREST

■ The plaintiff also argues that even though he may not have had a property interest in continued employment, his dismissal violated his procedural due process rights because it placed a "stigma" upon him without giving him a chance to reply to accusations which unjustly impaired his ability to obtain other employment. As the Eighth Circuit has recently noted:

> It is well established that there is a valid procedural due process claim if the claimant can show that his "good name, reputation, honor, or integrity" is at stake. *Board of Regents v. Roth, supra*, 408 U.S. at 573 [92 S.Ct. at 2707]; *Brouillette v. Board of Directors, supra*, 519 F.2d at 127–28.

*Kyles v. ENHSA, supra*, 632 F.2d at 61.

Where the government in discharging a public employee imposes on him a stigma or other disability that forecloses his freedom to take advantage of other employment opportunities, interests in "liberty" protected by procedural due process are implicated. *Roth, supra*, 408 U.S. at 573, 92 S.Ct. at 2707. However, this is not such a case. The stated reasons for Rose's discharge were his absences of November 22 and December 1, and his failure to appropriately notify his supervisor of his inability to work. Thus, the allegations of inadequacy against the plaintiff were relatively minor and not the sort that would seriously impair his ability to obtain future employment. *See Brouillette, supra*, 519 F.2d at 128; *Kyles, supra*, 632 F.2d at 61. The Court finds that these reasons do not rise to the level of stigma contemplated in *Roth*. Ev-

ery involuntary departure from employment carries with it some stigma, but the fact that nonretention in one job might make an employee "somewhat less attractive to some other employers would hardly establish the kind of foreclosure of opportunities amounting to a deprivation of 'liberty.'" *Roth, supra*, 408 U.S. at 574 n. 13, 92 S.Ct. at 2707 n. 13. At most, this is all that plaintiff has succeeded in showing.

■ Moreover, the Court finds that the reasons for Rose's termination were not publicly disclosed and, therefore, cannot properly form the basis for a claim that his interest in his "good name, reputation, honor, or integrity" was impaired. *See Bishop v. Wood, supra*, 426 U.S. at 348, 96 S.Ct. at 2079. The reasons for Rose's termination were kept in his personnel file and communicated only to the Nebraska Department of Labor upon plaintiff's request for unemployment insurance benefits. In April, 1978, when Rose voiced concerns about his discharge resulting in inability to obtain future employment, ENHSA closed his personnel file so that no information other than dates of employment and position title could be disclosed without written authorization from Rose. The evidence shows that ENHSA at no time received inquiries from prospective employers concerning Rose. Contrary to plaintiff's assertions, ENHSA did not advise the Department of Labor that Rose was discharged for being absent from work because of his arrest and incarceration. The evidence amply supports a finding that the Department of Labor was told that Rose was dismissed for his absences of November 22 and December 1, and for his failure to notify his supervisor, which was imperative in view of the facility's twenty-four hour coverage, and no more. It was Rose himself who informed the Department of Labor that he was arrested and incarcerated on suspicion of robbery at the time he was absent from work, and that he had been terminated for missing the four days of his incarceration without calling in. Plaintiff's Exhibit 11. Accordingly, the Court rejects plaintiff's allegation that the Nebraska Department of Labor investigation, instigated by Rose's

application for unemployment benefits, constitutes the "stigma" contemplated by *Roth*. Cf. *Kyles v. ENHSA, supra*, 632 F.2d at 61 (complaints of immoral conduct furnished only to two-man investigatory committee at plaintiff's request did not constitute public disclosure).

While the Court has already concluded that the reasons given for plaintiff's discharge were not false, it notes that plaintiff's argument to that effect in reference to this claim are immaterial. As noted in *Bishop v. Wood, supra*, 426 U.S. at 349–50, 96 S.Ct. at 2079–80, the truth or falsity of such a supervisor's statement "determines whether or not his decision to discharge the petitioner was correct or prudent, but neither enhances nor diminishes petitioner's claim that his constitutionally protected interest in liberty has been impaired."

In conclusion, the Court finds that defendants' actions have not deprived Rose of any interest in liberty or property protected by the Fourteenth Amendment. That ends the Court's inquiry into defendants' actions. Plaintiff's argument that a less harsh alternative than termination should have been taken by defendants need not be considered. The wisdom of defendants' actions is not at issue here. The Supreme Court has clearly expressed the limited scope of judicial review of employment decisions under the Fourteenth Amendment:

> The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies. We must accept the harsh fact that numerous individual mistakes are inevitable in the day-to-day administration of our affairs. The United States Constitution cannot feasibly be construed to require federal judicial review for every such error. In the absence of any claim that the public employer was motivated by a desire to curtail or to penalize the exercise of an employee's constitutionally protected rights, we must presume that official action was regular and, if erroneous, can best be corrected in other ways. The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions. *Bishop v.*

*Wood, supra*, 426 U.S. at 349–50, 96 S.Ct. at 2079–80.

Accordingly, since plaintiff has failed to prove a right to recover under any of his claims, a separate order shall be issued contemporaneously with this memorandum opinion dismissing plaintiff's complaint on the merits.